**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**REZA KAZIMI,**

**Plaintiff,**

**v.** **Civ. No. 24-689 JCH/JMR**

**DIVERSIFIED PROTECTION CORPORATION,**

**Defendant.**

## MEMORANDUM OPNION AND ORDER

This employment case is before the Court on *Defendant DPC's Motion for Summary Judgment* [Dkt. No. 70]. Plaintiff has filed his response [Dkt. No. 79] and Defendant has replied [Dkt. No. 85], and therefore the motion is fully briefed. For the reasons set forth more fully herein, the motion will be granted.

## PROCEDURAL BACKGROUND

Plaintiff Reza Kazimi ("Kazimi") worked as a protective service officer ("PSO") for Defendant Diversified Protection Corporation ("DPC"). DPC terminated Kazimi's employment on May 23, 2023. Because Kazimi was subject to a collective bargaining agreement ("CBA"), the union grieved his termination. Dkt. Nos. 70-2 and 70-3. The grievance went to arbitration as prescribed by the CBA. However, while the arbitration was pending, on September 5, 2023, Kazimi filed a discrimination charge with the New Mexico Department of Workforce Solutions, Human Rights Bureau ("HRB"). Dkt. No. 70-4. In the charge, Kazimi alleged that DPC violated the New Mexico Human Rights Act by discriminating against him based on his race and national origin (Afghan), and by retaliating against him for reporting racist comments by a coworker. *Id.*

On March 4, 2024, the arbitrator rejected Kazimi and his union's grievance and upheld his discharge for cause. Dkt. No. 16-2. Kazimi did not appeal the arbitrator's decision. On March 11, 2024, Kazimi asked the Human Rights Bureau ("HRB") to close its investigation and issue an Order of Non-Determination on his EEO charge. Dkt. No. 70-5. The same day, the HRB issued its Non-Determination Order. Dkt. No. 70-6.

Plaintiff then filed the current lawsuit in New Mexico state court on June 5, 2024. Dkt. No. 1-2. He alleged claims against DPC for employment discrimination based on race, color, and age, as well as hostile work environment, in violation of the New Mexico Human Rights Act ("NMHRA"), retaliation in violation of the NMHRA, wrongful discharge, and prima facie tort. *Id*. DPC timely removed the case to this Court on diversity jurisdiction. Dkt. No. 1. In the motion currently before the Court, DPC requests summary judgment in its favor on all of Kazimi's claims.

## LEGAL STANDARD

"[T]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' and a fact is material when it 'might affect the outcome of the suit under the governing [substantive] law.'" *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016) (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). "In applying this standard, [the court] view[s] the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party." *Parker Excavating, Inc. v. Lafarge W., Inc*., 863 F.3d 1213, 1220 (10th Cir. 2017) (quotations omitted).

## FACTS

Viewed in the light most favorable to the Plaintiff, the material facts are as follows:

DPC provides security-related services to public and private industry, including a contract with Federal Protective Services ("FPS"), a law enforcement agency responsible to federal facilities. As part of its contract, DPS provides security personnel and access control to various federal agencies and for federal buildings, including courthouses. On June 22, 2022, DPC hired Kazimi as a PSO under its contract with FPS. The CBA applicable to the union and DPC had an anti-discrimination clause prohibiting discrimination on the basis of, *inter alia*, race, color, national origin, age, sex, or veteran status. Dkt. No. 16-1 at 6, ¶ 5.1. During his employment, Kazimi was posted to various federal buildings in Bernalillo County, New Mexico. Kazimi's position is covered by a collective bargaining agreement ("the CBA") between DPC and the officers' union, the United Government Security Officers of America ("UGSOA").

The FPS has an employee manual and resource tool known as the SMART Book which contains various policies and procedures. Section 10.2 of the SMART Book lists grounds for possible disciplinary action "up to and including removal" for a list of infractions that include, which includes in relevant part:

- Disorderly conduct—abusive or offensive language, quarreling, fighting or attempting to intimidate someone; interfering with normal, efficient operations or performing your assigned duties
- Disregarding orders, including your post orders, special orders or instructions, or verbal instructions from your supervisor(s) …
- Insubordination towards visitors, your supervisors(s) or government personnel

Dkt. No. 70-9 at 2-3. Another section of the SMART Book, § 2.1.3, addresses weapons and equipment to be worn by PSOs. *Id*. at 4-5. It states, in relevant part, "Wear only the accessories that you are qualified to handle and are issued by your employer in accordance with the contract .

. . . *You are prohibited from carrying or using personal weapons, knives, blackjacks, rifles, or any other items/equipment not specified in the contract*." *Id*. (emphasis in original).

Plaintiff admits that the SMART Book contains these statements and admits that on December 13, 2021, he acknowledged (by checking a box on a form) receiving DPC's harassment policy. Dkt. No. 70-24 at 82. However, Plaintiff never actually received the SMART Book or any training on its contents; when he was hired he was told to just check the box and not worry about it. *Id*. at 84; Dkt. No. 79-2 at 72, 74-75. Plaintiff also testified that by the time he was hired in June of 2022 he had passed a test regarding the SMART Book given by the FPS. Dkt. No. 70-24 at 100-101.

On January 17, 2023, Plaintiff made an oral complaint to a supervisor regarding a co-worker, PSO Sean O'Mara,[1] who told a member of the public (untruthfully) while he and Kazimi were working together that Plaintiff had served in the Taliban. Two supervisors, Marcial Lujan and Jose Sandoval, met with Kazimi and O'Mara separately to discuss the matter. Both men acknowledged ongoing "crap talk" between them. Dkt. No. 70-16. Lujan and Sandoval directed both men to cut the "crap talk" and joking between them. Dkt. No. 70-16; Dkt. No. 70-24 at 195. There is no evidence that O'Mara was disciplined for his comment. Doc. 79-3 at 2 (Plaintiff's Ans. to interrogatory #14). Plaintiff believed that Lujan had submitted the issue to his supervisor, and one supervisor (Captain Graham) stated he would report it up the chain of command to be investigated, but no investigation or punishment came of it. Dkt. No. 79-3 at 2; Dkt. No. 79-2 at 167-171. DPC has no record of Plaintiff bringing a formal complaint against O'Mara or otherwise

[1] The parties' briefs contain an alternate spelling for this individual, "Omara." The Court does not know which spelling is correct but simply chose the other spelling, O'Mara, for purposes of this opinion.

escalating his concerns based on O'Mara's statement. Dt. No. 70-13 at ¶ 4; Dkt. No. 70-24 at 84; Dkt. No. 79-4 at 2. Plaintiff continued to work alongside O'Mara, who continued to make racist comments. *Id*.[2] Although Plaintiff testified that he believed DPC treated him badly for being Afghani-American, the only individual he believed did so was O'Mara, who was neither a supervisor nor a manager. Dkt. No. 70-24 at 191.

On March 30, 2023, the UGSOA local president emailed Tim Lopez of Defendant DPC, stating that "members had questions about the DPC supervisor[s'] recent uniform and equipment inspections. Officers have been reporting that the supervisors are giving verbal warnings to those who have 'unapproved items' on their duty belts." Dkt. No. 70-19. The email asked Lopez to provide inspection records showing which officers had received verbal warnings and what the specific unapproved items are so that all officers could be made aware of the "sudden changes." *Id*. Montano also noted that "some of the officers in question have had these unapproved items on their duty belts since their first day on post." *Id*. Kazimi's uncontroverted testimony is that he carried a pocketknife beginning his first day on the job, management saw that, and no one told him that he must stop until his interactions with Riley beginning on April 19, 2023. Kazimi Depo., Dkt. No. 79-1 at 178-179. Kazimi declined to name other DPC employees who carried pocketknives, but DPC provided the statement of Richard Worthington, Dkt. No. 70-18, who stated that on April 19, 2023, DPC supervisor Lt. J. Sandoval conducted a uniform inspection and, finding that

[2] Plaintiff has not offered any admissible evidence regarding the specific comments made by O'Mara. However, in its statement of undisputed material facts, DPC states that O'Mara told a member of the public that Kazimi had served in the Taliban. Dkt. No. 70 at 8, ¶ 12. Plaintiff does not dispute this description of O'Mara's actions. Accordingly, the Court accepts it as true for the purpose of ruling on summary judgment. In addition, Plaintiff does present evidence that O'Mara accused Kazimi of lying about receiving a Purple Heart medal and then demanded that Plaintiff show it to him. Kazimi Depo., Dkt. No. 79-2 at 168; Dkt. No. 79-3 at 3.

Worthington had a pocketknife, told Worthington that he would have to "ding" him on the inspection. *Id*. When Worthington challenged this, stating that the PSOs needed pocketknives as a tool to open boxes that were too large to go through the X-ray machine, and Lt. Sandoval suggested using scissors instead. *Id*.

In April of 2023, Michael Riley was a shift supervisor for DPC. Dkt. No. 70-15 at ¶ 1. Almost three weeks after Lopez wrote his letter, on April 19, 2023, while conducting uniform inspections on his shift, Riley observed Plaintiff carrying a pocketknife. *Id*. at ¶ 9. Riley reminded Plaintiff of the policy against pocketknives and directed him to remove it from the property. *Id*. Riley also asked Worthington if he had a knife, which he denied. Dkt. No. 70-18. The next day, on the evening of April 20, 2023, Kazimi was working at the U.S. Courthouse.[3] Plaintiff agreed to continue working after his evening shift ended to cover a portion of an absent officer's graveyard shift. Dkt. No. 70-15 at ¶ 10. Riley, Kazimi's shift supervisor, was scheduled to relieve Plaintiff at 5:30 a.m. the following morning, April 21. *Id*. Riley averred that on the evening of April 20, 2023, he again observed Plaintiff carrying a pocketknife on duty. *Id*. at ¶ 10. Riley states that again he reminded Plaintiff of the policy against pocketknives on duty and instructed him to remove it from

[3] The Court agrees with Plaintiff that the arbitrator's factual findings regarding the events of April 20-21, 2023, should not be determinative of the Court's findings of undisputed material facts for purposes of DPC's motion for summary judgment in this case, which presents federal statutory claims not before the arbitrator. Therefore, the Court turns to the admissible evidence provided by the parties with their briefs. The only admissible evidence regarding what happened between Plaintiff and Riley on April 20-21, 2023, is Riley's own Declaration, Dkt. No. 70-15. Defendant's brief claims that Plaintiff admitted to certain actions in a written statement given to DPC during its investigation that it attached to its brief-in-chief as Exhibit 22, but that document is missing from the record. *See* Dkt. No. 70. DPC's Summary of Investigation Report, Dkt. No. 70-17, notes that "[m]ost of Kazimi's statement contradicted Lt. Riley's account of what happened that night. Kazimi did admit to saying, 'This is fucken bullshit' in his written statement and to signing out at 0500 hours." Finally, Plaintiff has not provided the Court with admissible evidence contradicting Riley's version of events on April 20-21, 2023.

the property. *Id*. The next morning before the shift ended, Riley returned to the U.S. Courthouse to perform another uniform inspection. *Id*. at ¶ 11. He approached Plaintiff, who turned his body so that Riley could not inspect the left side of his uniform. *Id*. Then, Plaintiff walked away from Riley. *Id*. Plaintiff returned a few minutes later carrying his lunch box. *Id*. at ¶ 12. Riley asked him to stay to discuss the pocketknife, but Plaintiff signed out and told Riley to "go fuck yourself," and "don't ever talk to me that way again." *Id*. Plaintiff then left the building at 5:00 a.m., thirty minutes before the end of the shift he was covering. *Id*. As he left the building, Plaintiff continued to direct foul language at Riley and at DPC. *Id*. Riley reported the incident to his supervisors. *Id*. at ¶ 13.

After the incident with Riley on April 21, 2023, DPC suspended Kazimi pending an investigation. Dkt. No. 70-21. The Personnel Action Report describes "the action, date and shift, and its impact on the client and/or DP Security" as follows: "It is alleged that on April 20, 2023, Officer Kazimi was insubordinate, abandoned his post, failed to comply with an inspection, and possessed a prohibited item (personal weapon) while on duty." Dkt. No. 70-21. The UGSOA filed a grievance disputing the suspension. Dkt. No. 70-11 at ¶ 3. On May 23, 2023, DPC terminated his employment. Dkt. No. 70-23. The decision to terminate his employment was made by Kristine Utz, Contract Administrator for DPC. Dkt. No. 70-11 at ¶ 1, 4. The termination letter states that the termination

> comes as a result of [Kazimi] not following rules and procedures as stated in the FPS Smartbook, Federal Government Building Prohibited Items, Failure to follow DPC Policies and Section 7.6 "Discharge or Suspension" of the New Mexico – CBA. This action is in violation of Company Policy 5-1 "Workplace Conduct," as referenced in the Diversified Protection Corporation Virginia Employee Handbook, the site's Post Orders, and the governing Collective Bargaining Agreement.

*Id*.

Because Kazimi was subject to a collective bargaining agreement ("CBA"), the union grieved his termination. Dkt. Nos. 70-2 and 70-3. The union filed two grievances. The first asserted that Kazimi's termination violated § 5.1, the anti-discrimination provision of the CBA. Dkt. No. 70-2; Dkt. No. 16-1 at 6. The second grievance, Dkt. No. 70-3, asserts that DPC violated § 7.2 of the CBA, Dkt. No. 16-1 at 7, which provides that "no Employee shall be dismissed or suspended without just cause." In his decision, the arbitrator does *not* mention § 5.2 of the CBA (the anti-discrimination provision), but only portions of § 7 dealing with discharge or suspension.

**DISCUSSION**

As a preliminary matter, the Court notes that Plaintiff has conceded that DPC is entitled to summary judgment on his claims for wrongful discharge (Count 3) and prima facie tort (Count 4). Dkt. No. 79 at 2.

Kazimi has also conceded a portion of Count 1, discrimination in violation of the NMHRA. Plaintiff's Complaint alleges discrimination based on race, color, and age, as well as hostile work environment. In its opening brief, DPC argued that Kazimi had failed to exhaust his administrative remedies[4] for age discrimination and hostile work environment under Count 1 because his administrative charge of discrimination did not mention either claim. *See* Dkt. No. 70-4. The Court's review of the administrative charge confirms this to be the case, and Kazimi does not

[4] To bring an NMHRA lawsuit, a plaintiff is required to exhaust the administrative grievance process with respect to each defendant named in the complaint. *Lobato v. State Env't Dep't*, 2012-NMSC-002 at ¶ 10, 267 P.3d 65. *See also Luboyeski v. Hill*, 117 N.M. 380, 872 P.2d 353, 355-56 (N.M. 1994) (dismissing claims against individual defendants who had not been respondents in an administrative proceeding). To exhaust remedies under the NMHRA, a plaintiff must (1) file a complaint with the New Mexico Human Rights Bureau ("NMHRB") or the Equal Employment Opportunity Commission ("EEOC") that includes sufficient allegations to support the complaint; and (2) receive an order of non-determination from the NMHRB. *See Mitchell-Carr v. McLendon*, 127 N.M. 282, 980 P.2d 65, 70 (N.M. 1999).

respond to DPC's argument in his response brief. Accordingly, the Court interprets this to be a concession of the argument, and it concludes that DPC is entitled to summary judgment on the portion of Count 1 setting forth claims for age discrimination and hostile work environment in violation of the NMHRA because Kazimi failed to exhaust his administrative remedies.

In light of the foregoing, Kazimi's only remaining claims are for discrimination based on race and color (Count 1) and retaliation for protected conduct (Count 2), both alleged in violation of the NMHRA. Court will turn to the parties' arguments concerning each claim in turn.

## I. Arguments Concerning Whether Plaintiff's Claims Are Barred Entirely

First, DPC argues that it is entitled to summary judgment on the NMHRA claims as a result of the previous arbitration. That is, they assert that the claims are either preempted by federal labor law, barred by claim preclusion, or barred by issue preclusion.

### A. <u>Preemption and Res Judicata (Claim Preclusion)</u>

DPC asserts that the question of whether it discriminated against Kazimi (Count 1) is so intertwined with the interpretation of the CBA that the arbitration decision preempts his NMHRA claims. DPC simultaneously asserts that the NMHRA claims are barred by claim preclusion, thereby intertwining the two arguments. Finally, DPC argues that permitting Kazimi's claim to proceed "has the effect of vacating the labor arbitration award by a collateral action." Dkt. No. 70 at 18.

First, preemption does not apply because DPC has not shown that Plaintiff's claims for discrimination and retaliation are substantially dependent on analyzing the CBA. The Supreme Court has stated that § 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a) ("LMRA") will completely preempt a state law claim when resolution of the state law claim is substantially dependent upon analysis of the terms of the CBA between the parties. *See Caterpillar Inc. v.*

*Williams*, 482 U.S. 386, 394 (1987) ("Section 301 governs claims founded directly on rights created by collective-bargaining agreements" and claims substantially dependent on analysis of such arguments); *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 213 (1985) (stating that preemption analysis turns on whether the action confers rights on employers or employees "independent of any right established by contract, or, instead, whether evaluation of the tort claim is inextricably intertwined with consideration of the terms of the labor contract"). Here, Kazimi has a statutory right under the NMHRA to be free of race and national origin discrimination, as well as from retaliation for his protected conduct. DPC does not argue otherwise. That right is neither derived from nor dependent upon the CBA.

However, DPC argues that analysis of Kazimi's NMHRA "requires application of the CBA and consideration of the ongoing labor-management discussions about rights and duties under the CBA." Dkt. No. 70 at 21. The Court disagrees. DPC does not specify what provisions of the CBA the Court would have to analyze, nor does it explain why the Court would have to consider ongoing labor-management discussions about rights and duties under the CBA in analyzing Kazimi's NMHRA discrimination and retaliation claims. The parties' respective rights and duties under the CBA may have been an appropriate topic for the arbitration, but DPC does not explain why analysis of the CBA would pertain to the adjudication of Kazimi's NMHRA discrimination claims.

Second, DPC argues that Kazimi's claims are barred by the doctrine of claim preclusion. In New Mexico, claim preclusion or res judicata "bars relitigation of the same claim between the same parties or their privies when the first litigation resulted in final judgments on the merits." *Deflon v. Sawyers*, 2006-NMSC-025, ¶ 2, 139 N.M. 637, 137 P.3d 577 (2006) (citations omitted). The party asserting res judicata must satisfy four elements: (i) the same parties or parties in privity; (ii) the identity of capacity or character of persons for or against whom the claim is made; (iii) the

same subject matter; and (iv) the same cause of action in both suits. *See Apodaca v. AAA Gas Co.*, 2003-NMCA-085, ¶ 77, 134 N.M. 77, 73 P.3d 215 (Ct. App. 2003). Res judicata bars not only claims that were raised in the prior proceeding but also claims that could have been raised. *See Kirby v. Guardian Life Ins. Co.*, 2010-NMSC-014, ¶ 61, 148 N.M. 106, 124, 231 P.3d 87, 105 (2010) (citations omitted). Res judicata will only bar a claim "when there has been a full and fair opportunity to litigate issues arising out of that claim." *Kirby*, 2010-NMSC-014, ¶ 61.

Here, it appears that not all the elements of claim preclusion are satisfied. The first and second elements are met because the parties in this case are either the same (DPC as the defending party) or are in privity (Kazimi and UGSOA, both protesting Kazimi's discipline and termination). The third element is satisfied because the subject matter—whether DPC acted justifiably in suspending and terminating Kazimi's employment—are the same.

However, the fourth element, the same cause of action, is not present in both cases. Plaintiff could not have brought his NMHRA claim for discrimination in the arbitrator's proceedings, which were focused only on whether DPC's decision to terminate Kazimi violated the CBA. A review of the text of the arbitrator's decision [Dkt. No. 16-2] shows that the arbitrator did not expressly consider whether Kazimi's race, color or national origin played a role in DPC's actions; indeed, the arbitrator's decision mentions none of those things. Nor has the arbitrator decided whether animus over race or national origin, or retaliation for raising those issues, played any role in a retaliatory motive for Kazimi's termination. For example, when discussing the factual background, the arbitrator did not discuss Kazimi's race or national origin; the incidents in which O'Mara said that Kazimi had fought for the Taliban and implied he lied about having a Purple Heart; the fact that Kazimi had reported the first incident to his supervisors; or the temporal proximity (or lack thereof) between those events and Kazimi's termination. Dkt. No. 16-2 at 3-5. When discussing

the relevant provisions of the CBA, the arbitrator did not discuss or mention the anti-discrimination provision, focusing only on portions of the agreement regarding discipline and arbitration. *Id*. at 5-6 (listing "Relevant Collective Bargaining Agreement Provisions"). The arbitrator's summary of the parties' arguments contains no mention of discrimination or retaliation. *Id.* at 7-8.

The only reasonable inference from the record is that the grievance that mentioned violation of the anti-discrimination provision of the CBA was *not* before the arbitrator. DPC's argument to the contrary is unconvincing. DPC relies on a post-hearing memorandum filed by the union, Dkt. No.70-7 at 2, which stated, "Riley showed obvious signs of bias or hostility towards Kazimi." However, none of the evidence cited in the union's brief related to Kazimi's race, color, or national origin. In fact, the union's brief does not mention discrimination based on race, color, or national origin, and it does not mention retaliation for Kazimi reporting the "Taliban" incident. DPC highlights a few phrases in the memorandum, such as "Riley showed no obvious signs of bias or hostility towards Kazimi," "Riley's demands were harassment," and "terminating Kazimi for abandoning post is clear disparate treatment." Dkt. No. 70-7 at 2, 3, and 4. However, nothing in the memorandum suggests that the arbitrator grappled with and decided the question of whether in disciplining and firing Kazimi, DPC discriminated against him because of his race, national origin, or color, or whether it retaliated against him for reporting O'Mara's racially charged statement. The arbitrator mentions none of those things. The logical inference from the text of the arbitrator's decision, which does not mention that the CBA prohibits discrimination based on race, national origin, or other characteristics, is that he was not adjudicating the first grievance, nor was he considering race, color, or national origin discrimination.

In its reply, DPC does not dispute that argument. Nor can DPC credibly argue that Plaintiff was required to bring his NMHRA claim before the arbitrator—as discussed more fully below,

that would require a demonstration that the CBA contains a clear and explicit waiver of the right to bring statutory claims in court, and such a clause does not exist here. Therefore, the Court is unable to conclude that the arbitration involved the same discrimination and retaliation claims present in this lawsuit. Accordingly, the claim preclusion doctrine does not apply.

### B. <u>Collateral Estoppel (Issue Preclusion)</u>

DPC also argues that Plaintiff's claim of discriminatory discharge is barred by the doctrine of collateral estoppel, or issue preclusion.

"[C]ollateral estoppel, also called issue preclusion, prevents a party from re-litigating 'ultimate facts or issues actually and necessarily decided in a prior suit.'" *Ullrich v. Blanchard*, 2007-NMCA-145, ¶ 19, 142 N.M. 835, 171 P.3d 774 (quoting *Deflon v. Sawyers*, 2006-NMSC-025, ¶ 13, 139 N.M. 637, 137 P.3d 577; *Adams v. United Steelworkers of Am*., 97 N.M. 369, 373, 640 P.2d 475, 479 (1982)). For collateral estoppel to apply, four elements must be met: "(1) the parties in the current action were the same or in privity with the parties in the prior action, (2) the subject matter of the two actions is different, (3) the ultimate fact or issue was actually litigated, and (4) the issue was necessarily determined." *Ullrich*, 2007-NMCA-145, ¶ 19 (quoting *City of Sunland Park, Santa Teresa Servs. Co. v. Macias*, 2003-NMCA-098, ¶ 10, 134 N.M. 216, 75 P.3d 816). If the party invoking the doctrine establishes a prima-facie case, then the burden shifts to the party opposing collateral estoppel to show that he or she was not afforded a fair opportunity to litigate the issue in the prior proceeding. *See Padilla v. Intel Corp*., 1998-NMCA-125, ¶ 9, 125 N.M. 698, 964 P.2d 862; *State v. Bishop*, 1992-NMCA-034, ¶ 8, 113 N.M. 732, 832 P.2d 793.

As previously discussed, the text of the arbitrator's decision shows that the parties did not litigate the question of whether DPC's decision to fire Kazimi was the result of discrimination based on race or national origin. They also did not litigate the question of whether the termination

was in retaliation against Kazimi for his previous protected conduct in complaining to his supervisor about O'Mara's racially charged statements to him. The arbitrator's decision demonstrates that a potential violation of the CBA's anti-discrimination provision was not before him.

DPC argues that the CBA required Kazimi to submit his NMHRA discrimination and retaliation claims to arbitration. However, that argument fails as well. In *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 259 (2009), the Supreme Court noted that for a CBA to require arbitration of statutory antidiscrimination claims (which is a waiver of the employee's the right to file such claims in court), the waiver must be "explicitly stated" in the CBA. *Id*. (quoting *Wright v. Universal Mar. Serv. Corp*., 525 U.S. 70, 79-80 (1998) (requiring the waiver to be "clear and unmistakable"). DPC does not point to any provision in the CBA that explicitly states that union members are waiving their right to bring their statutory discrimination claims to court. DPC points only to the anti-discrimination clause in the CBA. However, that clause does not contain a "clear and unmistakable" statement that employees must bring their statutory discrimination claims in an arbitration proceeding.

On the record before the Court, those issues were not actually litigated, nor were they necessarily determined in the arbitration. Accordingly, the doctrine of issue preclusion does not bar Plaintiff's claims in this case.

## II. Whether the Undisputed Material Facts Support Kazimi's Claims

DPC argues that under Rule 56, the undisputed material facts do not support Kazimi's claims for race and color discrimination and retaliation.

### A. <u>Discrimination</u>

The NMHRA makes it unlawful to discharge or otherwise discriminate against any individual with respect to his compensation, terms, or conditions of employment because of his race, color, religion, sex, or national origin. NMSA 1978, § 28-1-7(A). New Mexico courts have adopted the "federal burden-shifting methodology" of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973) [hereinafter "*McDonnell Douglas*"] which applies "when considering a violation of the NMHRA." *Juneau v. Intel Corp.*, 2006-NMSC-002, ¶ 9, 139 N.M. 12, 127 P.3d 548. Under *McDonnell Douglas*, an employee bears the initial burden of demonstrating a prima facie case of discrimination, which then shifts the burden to the employer to provide a legitimate, non-discriminatory reason for the adverse employment action. *Gonzales v. N.M. Dep't of Health*, 2000-NMSC-029, at ¶ 21, 129 N.M. 586, 11 P.3d 550. Then, at step three, the employee can rebut the employer's proffered reason as pretextual or otherwise inadequate. *Ibid*.[5]

To defeat summary judgment on his discrimination claim, Kazimi first must come forward with evidence to support a prima facie case by showing that: (1) he belonged to a protected class, (2) suffered an adverse employment action, and (3) the challenged action took place under circumstances giving rise to an inference of discrimination. *See Throupe v. Univ. of Denver*, 988 F.3d 1243, 1252 (10th Cir. 2021) (Tymkovich, C.J.).

DPC does not appear to dispute that Kazimi is of Afghan origin and that he belongs to a protected class. It is also undisputed that Kazimi suffered two adverse employment actions: suspension and termination of employment. Therefore, the only area of dispute is whether Kazimi has brought forth sufficient evidence to show that the circumstances of his suspension and

[5] The parties did not brief the second and third steps of the *McDonnell Douglas* burden shifting methodology—legitimate, non-discriminatory reason and pretext. Therefore, the Court does not address them here.

termination give rise to an inference of discrimination. After reviewing the evidence in the record, the Court concludes that Kazimi has not met his burden on the third prong of his prima facie case.

First, Kazimi points to racially charged statements made by his co-worker, O'Mara, in January of 2023. However, the evidence is that O'Mara was Kazimi's peer; he was not a supervisor, nor did he have any power over the terms and conditions of Kazimi's employment, and therefore O'Mara could not have exercise discriminatory control over the terms of Kazimi's employment. The evidence in the record shows that after speaking to both men, supervisors concluded that there was a pattern between the two men of exchanging hostile barbs and cautioned them both to stop. Kazimi offers no evidence to the contrary. There is no evidence that this result was racially motivated nor that it was linked to Kazimi's suspension and termination.

Second, Kazimi argues that discriminatory animus can be inferred from the fact that DPC's explanation for his termination shifted over time, which permits the fact finder to infer unlawful discrimination. Dkt. No. 79 at 17. Kazimi's evidence for this "shift" is two documents, Dkt. Nos. 79-5 and 79-6, both of which were created by the union (not DPC) in an effort to dispute Kazimi's termination. In the first document, a Grievance Investigation Fact Sheet, the union states that "Kristine Utz claims he was terminated for abandoning post." This is not a statement by Utz or another representative of DPC but rather by the union representing its own *interpretation* of Utz's position. As an out-of-court statement offered for its truth, the statement is hearsay and therefore inadmissible. The second document, Dkt. No. 79-6, is a letter from the local union president requesting that DPC reconsider firing Kazimi. To the extent that the letter attempts to convey any out-of-court statement by Utz or other DPC management, it is also inadmissible hearsay. Neither document is admissible evidence of DPC giving changing explanations of its reasons for terminating Kazimi.

Third, in his brief Kazimi argues that other non-Afghan employees carried pocketknives on duty but suffered no disciplinary repercussions, while he was suspended and terminated for doing so. Dkt. No. 79 at 2. However, Kazimi comes forward with no evidence regarding specific incidents involving such employees. On the other hand, the evidence shows that many employees *including Kazimi* carried pocketknives without repercussions until March of 2023, when DPC's supervisors started to enforce the rules against carrying various unapproved items, including pocketknives, and that this enforcement occurred against employees other than Kazimi. The evidence shows that this enforcement effort began no later than March 30, 2023—several weeks before the April 20-21, 2023, incident in which Kazimi refused inspection—when enough PSOs had been "written up" for various infractions such that the union representative felt compelled to write to the company to seek clarification of the rules. No evidence in the record suggests that this enforcement was directed only at Kazimi or only at employees of Afghan origin or even at minorities generally.

Fourth, Kazimi has not come forward with evidence of any similarly situated non-Afghan employee who was treated differently by DPC.[6] Kazimi argues in his brief that other non-Afghan employees who abandoned their posts received only a one-day suspension. Dkt. No. 79 at 2. However, the only evidence Kazimi comes forward with to support that statement is a vague,

[6] The Court agrees that Plaintiff's vague description of an unnamed employee of an employee who vandalized a photo of President Biden and was "briefly suspended," Dkt. No. 70-26 at 2 and Dkt. No. 70-24 at pp. 182-184, is inadequate to create an inference of discrimination. In offering this evidence Kazimi did not come forward with such information such as the employee's name, whether that employee is a member of a protected group, and whether Plaintiff has personal knowledge of the discipline this employee received (as opposed to having heard about it through the rumor mill). Evidence that is not based on personal knowledge is inadmissible. The same is true of Kazimi's discovery response regarding an employee named "Mr. Torance," Dkt. No. 70-26 at 2, regarding whom no other information is offered.

single-sentence allegation in the union's grievance of Kazimi's termination. Dkt. No. 70-3. However, there is no evidence regarding the name of the comparator employee, the date of the incident, the race or national origin of the employee, or the circumstances of his alleged abandonment. The Court cannot conclude that such person is a proper comparator for Kazimi, who according to the undisputed material facts (1) was found with a pocketknife at work and was verbally reprimanded; (2) the next day, brought a pocketknife to work again and was told a second time that he could not do so; (3) hours later, refused his supervisor's efforts to conduct an inspection during a second shift by turning his body away and left the room, effectively refusing to submit to inspection; (4) returned to the room while telling the supervisor "to go fuck himself," and then (5) departed the work site 30 minutes before the end of his shift. In other words, Kazimi's actions involved significantly more than merely abandoning his post. It is reasonable to assume that most employees would expect to be fired for that behavior in the workplace. In the absence of evidence of a non-Afghan PSO who behaved in a similar manner to Plaintiff yet received lesser discipline, the Court cannot reasonably infer discrimination.

In sum, Kazimi has not come forward with sufficient direct or circumstantial evidence to show that any person at DPC with supervisory authority suspended or fired him out of discriminatory animus based on Kazimi's race, color, or national origin.

**B. Retaliation**

DPC argues that Kazimi's claim for retaliatory discharge fails for the same reasons as his discrimination claim, and it argues that no reasonable jury could find that there is a causal connection between Kazimi reporting O'Mara's racially charged "Taliban" comment to his supervisors and his later suspension and termination. The Court agrees. Just as there is insufficient direct or indirect evidence of discrimination, the evidence of retaliatory motive is inadequate.

Under the NMHRA, an employer is liable for retaliation when it "engage[s] in any form of threats, reprisal or discrimination against any person who has opposed any unlawful discriminatory practice or has filed a complaint, testified or participated in any proceeding under the [NMHRA]." NMSA 1978, § 28-1-7(I)(2). A plaintiff suing for retaliation under the NMHRA must establish that (1) he engaged in protected activity; (2) he suffered an adverse employment action subsequent to or contemporaneous with the protected activity; and (3) there is a causal connection between these two events. *Ocana v. Am. Furniture Co*., 2004-NMSC-018, ¶ 33, 135 N.M. 539, 91 P.3d 58. *See also Imming v. De La Vega*, No. A-1-CA-39116, 2023 WL 1434061 at *1; *Kuhler v. PHI Health, LLC*, 748 F. Supp. 3d 1059, 1070 (D.N.M. 2024). Because DPC does not contest the first and second elements, the Court assumes without deciding that Kazimi's verbal complaint to his supervisors regarding O'Mara's comments constitute protected activity.

As previously discussed, there is no direct evidence that Plaintiff's termination was linked to his complaint about O'Mara. In the absence of direct evidence of causal connection, a plaintiff may show a causal connection by "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Burrus v. United Tel. Co. of Kan., Inc*., 683 F.2d 339, 343 (10th Cir. 1982). Unless close temporal proximity exists between the protected activity and the retaliatory conduct, plaintiff must offer additional evidence to establish causation. *O'Neal v. Ferguson Constr. Co*., 237 F.3d 1248, 1253 (10th Cir. 2001). Generally, "if the adverse action occurs in a brief period up to one and a half months after the protected activity, temporal proximity alone will be sufficient to establish the requisite causal inference." *Conroy v. Vilsack*, 707 F.3d 1163, 1181 (10th Cir. 2013). *See also Velasquez v. Regents*

*of N. N.M. Coll.*, 2021-NMCA-007, ¶ 41, 484 P.3d 970 (finding that a few weeks between protected conduct and adverse employment action may support an inference of retaliatory motive).

The incident with O'Mara took place on January 17, 2023, and Kazimi's suspension and termination occurred on April 21 and May 23, 2023, respectively. These events are three and four months after the date on which Kazimi reported O'Mara's statements, respectively. That period of time is too long to constitute "temporal proximity" giving rise to an inference of discrimination. Accordingly, the Court finds that Kazimi has failed to come forward with evidence to support a prima facie case of retaliation, and DPC's motion for summary judgment should be granted.

**IT IS THEREFORE ORDERED** that *Defendant DPC's Motion for Summary Judgment* [Dkt. No. 70] is **GRANTED**, and Defendant is entitled to judgment in its favor on all of Plaintiff's claims.

SENIOR UNITED STATES DISTRICT JUDGE